# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

WILLIAM PENDLETON,                              Case No. 1:10-cv-650
      Plaintiff                                Dlott, J.
                                                Litkovitz, M.J.

    vs

COMMISSIONER OF                                 **REPORT AND**
SOCIAL SECURITY,                                **RECOMMENDATION**
      Defendant


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 14), the Commissioner's response in

opposition (Doc. 19), and plaintiff's reply memorandum. (Doc. 23).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in October 2005, alleging disability since

October 14, 2003, due to stomach pain, hernias, hypertension, diabetes, pain in his lower back

and left knee, hearing problems, pulmonary problems, and residuals of bowel surgery that

necessitated a colostomy. Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a de novo hearing before an Administrative

Law Judge (ALJ). Plaintiff and a vocational expert (VE) appeared and testified at the ALJ

hearing. On June 3, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI

applications. Plaintiff's request for review by the Appeals Council was denied, making the

decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence[1]

### A. Physical Impairments

In January 2006, plaintiff was examined by Dr. Martin Fritzhand, a consultative physician, at the request of the state agency. (Tr. 240-252). Plaintiff's chief complaints were his blood pressure and breathing, and he reported shortness of breath associated with walking or physical activity of any sort, that was relieved by sitting. (Tr. 245). Plaintiff denied chest pain, but had a chronic, nonproductive cough. *Id.* He reported that he smoked 3-4 packs of cigarettes per day until September 2005, but since then he cut back to 2 packs per day. *Id.* Upon examination, plaintiff had clear lungs, without rales, rhonchi, wheezes, or evidence of cyanosis (a blueish appearance due to lack of oxygen). (Tr. 246). Plaintiff had normal range of motion except in his ability to bend, extend, or laterally flex at the waist due to abdominal pain. (Tr. 242-244, 246). Plaintiff had no sensory deficits, no joint abnormalities, a normal gait, and full muscle strength. (Tr. 241, 246-247). Dr. Fritzhand concluded that plaintiff was "capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects." (Tr. 247). His diagnoses included "dyspnea secondary to tobacco abuse," and he opined that plaintiff "would obviously do best in a dust-free environment." *Id.* Pulmonary function studies conducted that day did not require a bronchodilator since they were within normal limits, and Dr. Fritzhand wrote that they revealed that plaintiff had a "very mild combined obstructive and restrictive pulmonary disease." (Tr. 249-250).

---

[1]As plaintiff's Statement of Errors is limited to whether the ALJ erred in his finding that plaintiff did not meet the Listing for mental retardation and whether plaintiff's RFC was limited by his use of an oxygen tank, the Court's recitation of the medical evidence focuses on evidence relevant to those claims.

In September 2006, Dr. Walter Holbrook reviewed plaintiff's file for the state agency. (Tr. 279-285A). He opined that plaintiff could lift, carry, push, and pull up to 50 pounds occasionally and 25 pounds frequently; and stand and/or walk and sit about six hours each in an eight-hour workday. (Tr. 280). This was consistent with medium level exertional work according to agency regulations. 20 C.F.R. §§ 404.1467(c), 416.927(c). He could never climb ladders, ropes, or scaffolds, but could occasionally climbs ramps or stairs. (Tr. 281). He could frequently balance, stoop, kneel, crouch, and crawl. *Id.* Dr. Holbrook recommended that plaintiff avoid concentrated exposure to noise, hazards, fumes, dusts, gases, or respiratory irritants. (Tr. 283).

In April 2007, plaintiff was discharged from the hospital and it was noted that "he will need to have smoking cessation." (Tr. 388). At home nasal oxygen was prescribed because he was not using a BiPAP (bilevel positive airway pressure) machine for sleep apnea, and it was noted that he "desaturated" at night time. *Id.*

In April 2007, plaintiff was re-examined by Dr. Fritzhand at the request of the state agency. (Tr. 414-420). Plaintiff again exhibited full muscle strength and mostly normal range of motion. (Tr. 414-417). Plaintiff alleged his shortness of breath had worsened, but he also admitted smoking four packs of cigarettes daily until March 2007; at this exam, he stated he was smoking just one pack per day. (Tr. 418). Physical examination revealed no rales, rhonchi, wheezes, or evidence of cyanosis in the lungs, though breath sounds were "distant." (Tr. 419). Dr. Fritzhand believed that obesity was contributing to his symptoms and "weight reduction would diminish his complaints." (Tr. 420). Pulmonary function tests from July 2007 revealed "moderate chronic obstructive pulmonary disease" (COPD). (Tr. 446-447).

In August 2007, plaintiff admitted to Dr. Ammer Ghanem, his treating pulmonary doctor, that he was not wearing his CPAP nightly as prescribed. (Tr. 824).

In September 2007, Dr. Ghanem first noted that plaintiff "may use oxygen as needed during daytime." (Tr. 821). In January 2008, Dr. Ghanem's notes reflect plaintiff was "using oxygen as needed during daytime." (Tr. 532; *see also* Tr. 535). Dr. Ghanem changed plaintiff's CPAP machine and facemask style in order to encourage compliance with CPAP treatment at night for sleep apnea. (Tr. 534, 818). He also ordered plaintiff to lose weight. (Tr. 534, 823). An earlier sleep study showed that plaintiff's sleep apnea could be fully controlled with proper usage of the CPAP machine. (Tr. 582).

In February 2008, Dr. Michael Butler reported that plaintiff was "reluctant or refuses" to take nasal sprays which would help his breathing problems. (Tr. 530). Dr. Butler recommended that plaintiff use his CPAP mask "as this is the most effective treatment, in my opinion, but he does not seem very motivated." *Id*. Chest x-rays revealed "no active disease in the chest." (Tr. 559).

In March 2008, plaintiff was still smoking 1-2 packs per day despite being offered smoking cessation materials. (Tr. 627). He was "instructed [that] he should not be smoking" and was prescribed Chantix, a smoking cessation drug. (Tr. 742).

In July 2008, a pulmonary function test revealed a "normal spirometry with isolated moderate airtrapping and increased airway resistence." (Tr. 655). That same month, Dr. Ghanem continued to recommend that plaintiff use oxygen during the daytime if he needed it. (Tr. 812). Upon exam, he had decreased breath sounds, but no wheezing, crackle or rales. (Tr. 813). His sleep apnea was improving, and he denied depression or anxiety. (Tr. 813).

In November 2008, plaintiff continued to smoke 2-3 packs per day, but his shortness of

breath improved with weight loss. (Tr. 810-811). Upon exam, he had decreased breath sounds, but no wheezing, crackle or rales. (Tr. 811). Dr. Ghanem recommended that plaintiff continue to lose more weight, increase his exercise, and stop smoking. *Id*.

### B. Mental Impairments

In December 2006, plaintiff was examined by Albert Virgil, Ph.D., at the request of the state agency. (Tr. 357-360). When asked why he was disabled, plaintiff referred to physical impairments but did not identify any mental limitations. (Tr. 357). Plaintiff stated he graduated from high school and was in special education classes. *Id*. He had only gone to two sessions of mental health counseling, both in mid-2006. *Id*. Dr. Virgil observed depressed mood but normal speech, insight, and judgment. (Tr. 358). It took plaintiff 46 seconds to count backwards from 20, he was unable to correctly recite the alphabet, and he was unable to count by threes from 1 to 40. Plaintiff reported he lived with his wife, mostly watched TV, and was able to go shopping. *Id*. He denied other activities, denied doing household chores, and denied doing any cooking. He also denied having any friends, hobbies, special interests, or structured social activities. *Id*. IQ testing revealed a verbal IQ of 64, a performance IQ of 67, and a full scale IQ of 62. (Tr. 359). While Dr. Virgil noted that these scores were within the mentally retarded level, he reported that plaintiff did not have an "adaptive behavior deficit," and his "actual functioning is estimated to be within the borderline level." *Id*. Dr. Virgil diagnosed Adjustment Disorder with Depressed Mood and Estimated Borderline Intellectual Functioning. (Tr. 360). He assessed a (Global Assessment of Functioning) GAF[2] score of 54, which indicated moderate

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. GAF scores from 41-50 indicate serious symptoms or impairments, including suicidal ideation, no friends, and inability to hold a job. DSM-IV-TR at 34. GAF scores from 51-60 indicate

symptoms or limitations. (Tr. 360). Dr. Virgil concluded plaintiff had moderate limitations in activities of daily living. *Id.* Despite limitations in attention and concentration, plaintiff could manage benefits, complete unskilled work activity, and cooperate with co-workers and supervisors in a work setting. *Id.*

In December 2006, a state agency reviewing psychologist, Dr. Bruce Goldsmith, reviewed plaintiff's records and opined that plaintiff did not have any mental impairments that met or medically equaled a Listing. (Tr. 361-378). Dr. Goldsmith opined that plaintiff would have moderate functional limitations in the areas of activities of daily living; mild limitations maintaining social functioning; and moderate limitations maintaining concentration, persistence or pace. Dr. Goldsmith also opined that plaintiff had no episodes of decompensation. (Tr. 375). Dr. Goldsmith noted that while plaintiff alleged he was in special education, there were no records that verified this claim. (Tr. 363). He wrote "no deficits in adaptive functioning prior to age 22 were documented and [plaintiff] does not meet the diagnostic criteria for mental retardation." *Id.* Dr. Goldsmith concluded that plaintiff was "capable of performing simple, routine, nonpublic tasks, without strict time or production demands." *Id.*[3]

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be

---

moderate symptoms, and scores from 61-70 indicate only mild symptoms. *Id.*

[3]Records from Shawnee Mental Health in July 2009 have not been considered by the Court because these records were submitted to the Appeals Council and were not considered by the ALJ. Where, as here, the Appeals Council declines review, it is the decision of the ALJ and therefore the facts before the ALJ that are subject to appellate review. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). The Court may not consider the new evidence presented to the Appeals Council in deciding whether to uphold, modify, or reverse the ALJ's decision. *Id.* at 696. *See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B.   The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant met the insured status requirements of the Social Security Act
through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since October 14,
2003, the alleged onset date (20 C.F.R. 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: chronic obstructive
pulmonary disease, history of colostomy with perforated diverticulitis, deafness,
obesity (height of 5'9" and weight of 250 pounds), depression, borderline
intellectual functioning, degenerative joint disease (knee and back pain),
hypertension, coronary artery disease with left ventricular ejection fraction of
55%, and sleep apnea (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that
meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the
claimant has the residual functional capacity to perform light work as defined in
20 C.F.R. 404.1567(b) and 416.967(b) except for that which involves crawling or
climbing ladders, ropes, or scaffolds; requires more than occasional balancing,
kneeling, crouching, or stooping/bending; involves concentrated exposure to
fumes, odors, chemicals, gases, dust, hazards, or loud noises; or consists of more
than simple, easy-to-learn, unskilled work with no stringent time or production
demands.

6. The claimant is capable of performing past relevant work as a dishwasher.  This
work does not require the performance of work-related activities precluded by the
claimant's residual functional capacity  (20 C.F.R. 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security
Act, from October 14, 2003 through the date of this decision (20 C.F.R.
404.1520(f) and 416.920(f)).

(Tr. 18-25).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).  *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ' s decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in assessing plaintiff's residual functional capacity; and (2) the ALJ erred in not finding the plaintiff's impairments meets Listing 12.05C.

#### 1.  Plaintiff's RFC

Plaintiff contends the ALJ erred in determining his RFC by not accurately assessing plaintiff's use of portable oxygen during the daytime.  As the ALJ noted in his decision, plaintiff carried bottled oxygen with him to the hearing.  (Tr. 23).  When asked about the impact of using portable oxygen on the ability to perform work activity, the VE explained that carrying a portable oxygen tank from point to point would preclude any work above the sedentary level because "use of oxygen would be just too cumbersome in any work setting other than sedentary exertional level."  (Tr. 916-17).  Specifically, the VE testified that "dependence or reliance upon oxygen on a regular and sustained basis limits a worker essentially to . . . sedentary employment."  (Tr. 919-20).  Plaintiff contends that Grid Rule 201.12, 20 C.F.R. Subpart P, App. 2, directs a finding of "disabled" if plaintiff is limited to sedentary work at age 50 (*i.e.*, as of October 17, 2007).

The ALJ's hearing decision does not address whether plaintiff is dependent or reliant upon oxygen on a regular and sustained basis and, if so, the impact of any such dependence on plaintiff's RFC.  The ALJ's decision addresses plaintiff's use of oxygen in only two respects.  First, the decision states, "Although claimant had a bottle of oxygen with him at the hearing, the record indicates that it was prescribed for sleep apnea."  (Tr. 23).  Second, the decision states, "Additionally, claimant's contention that he is unable to lift and carry even minimal weight is at odds with the fact that he carried a portable oxygen bottle into the hearing."  *Id.*

The ALJ's statement that plaintiff was prescribed oxygen for sleep apnea implies that plaintiff's use of oxygen was limited to nighttime use and, therefore, would not affect his RFC for light work during the daytime. However, the record reveals that plaintiff was prescribed supplemental oxygen for reasons other than sleep apnea.

In April 2007, Dr. Saab prescribed "home nasal O2" for chronic obstructive pulmonary disease. (Tr. 388). Reports from plaintiff's pulmonary physician, Dr. Ghanem, also show that starting in March 2008, plaintiff was prescribed two liters per minute of oxygen with a humidity conserving device "as directed." (Tr. 810, 812, 815). While Dr. Ghanem's records do not specify how plaintiff was directed to use this device, plaintiff testified that he uses an oxygen "concentrator" at home and that he is "generally on [his] concentrator oxygen" when he is at home. (Tr. 897). Plaintiff's pulmonary doctor further reported that beginning in September 2007 plaintiff "may use O2 [oxygen] prn [as needed] during daytime." (Tr. 810, 812, 815, 818, 821). Plaintiff testified he has used oxygen for the past two years. He testified that he carries portable oxygen when he leaves his home (Tr. 893, 896) and uses the oxygen "concentrator" while he is at home. (Tr. 897).

The Commissioner contends that plaintiff's claim he is oxygen dependent is significantly undermined by his continued smoking. The Commissioner also argues that plaintiff's failure to quit smoking as directed by his doctors and to comply with his medication regime undercuts his claim that his need for portable oxygen prevents him from working. The Commissioner asserts that in light of this evidence "it was reasonable for the ALJ to find he was not oxygen-dependent and could perform light work." (Doc. 19 at 17).

11

While the factors cited by the Commissioner are certainly relevant to the ALJ's determination of plaintiff's credibility, the problem here is that the ALJ never actually made a finding that plaintiff was "not oxygen-dependent." The ALJ wholly failed to address plaintiff's use of oxygen other than with his CPAP machine at night. This omission is not harmless error because if plaintiff is dependent on oxygen on a regular and sustained basis during the daytime, he would be limited to sedentary jobs according to the VE testimony; and if limited to sedentary work, plaintiff would be found disabled on the grid at age 50. The ALJ's failure to address this evidence is reversible error. Therefore, because the ALJ never addressed the question of whether plaintiff was reliant on oxygen during the daytime and, if so, the effect thereof on his capacity for work activity, the Court cannot conclude that the ALJ's RFC finding for light work is supported by substantial evidence.

The Court recognizes that it is the ALJ's responsibility to formulate the RFC. *See* 20 C.F.R. § 404.1546(c). In rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and rejected to enable this Court to perform a meaningful judicial review of that decision. Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at his RFC determination. Based on the state of the current record and the ALJ's decision, the Court is unable to discern whether the ALJ considered and rejected the evidence of daytime oxygen use, or merely overlooked such evidence. For these reasons, the Court finds that the ALJ's RFC determination is not supported by substantial evidence and should be reversed and this case remanded to obtain a medical opinion on plaintiff's need for and frequency of use of oxygen during the daytime.

**2. Listing 12.05C**

Listing 12.05 provides in pertinent part:

Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

A claimant will meet Listing 12.05C for mental retardation "only '[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria. . . .'" *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)). In recognition of the fact that individuals with mild mental retardation may still be able to work, the Social Security regulations require claimants who satisfy the diagnostic description of Listing 12.05C to produce a valid IQ score of 70 or below and demonstrate "a physical or other mental impairment imposing an additional and significant work-related limitation of function" to be considered disabled. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05C; *see also Grenham v. Astrue*, No. 08-cv-11151, 2009 WL 1209026, at *5 (D. Mass. May 4, 2009) ("the Listings reflect this reality [that a person with mild mental retardation may be able to work and maintain a household], as they require a claimant to demonstrate another impairment apart from mild mental retardation before they can be found disabled") (citing *Nieves v. Sec. of Health & Human Services*, 775 F.2d 12, 14 (1st Cir. 1985));

13

*Muntzert v. Astrue*, 502 F. Supp.2d 1148, 1157–58 (D. Kan. 2007) ("DSM–IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work. However, they recognize that some mildly mentally retarded individuals may be unable to work where they have 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'").  Accordingly, to satisfy Listing 12.05C, a claimant must show (1) "significantly subaverage general intellectual functioning;" (2) "deficits in adaptive functioning"[4] which initially manifested during the developmental period (*i.e.*, before age 22); (3) a valid IQ score between 60 through 70; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function.  *Daniels v. Comm'r*, 70 F. App'x 868, 872 (6th Cir. 2003).

The ALJ determined that plaintiff did not meet Listing 12.05C for mental retardation "because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (Tr. 20).

Plaintiff asserts the ALJ erred in failing to find his impairments meet Listing 12.05C. Plaintiff cites to the verbal, performance, and full scale IQ scores of 64, 67, and 62 respectively assessed by Dr. Virgil, the consultative psychologist.  (Tr. 359).  Plaintiff contends there is no evidence supporting the ALJ's finding of invalid IQ scores.  (Tr. 20).  Plaintiff acknowledges that

---

[4]"Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  DSM-IV, p. 42.  "Adaptive functioning" includes the plaintiff's "effectiveness in areas such as social skills, communication, and daily living skills."  *West v. Comm'r Soc. Sec. Admin*., 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)).  Mental retardation requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  DSM-IV, p. 49.

Dr. Virgil opined that plaintiff did not meet the adaptive behavior deficit criteria and that plaintiff's estimated functioning was in the borderline level. (Tr. 359). Nevertheless, plaintiff disputes Dr. Virgil's findings and contends that the Listing for mental retardation only requires deficits or impairments in present adaptive functioning which the record evidence establishes in this case, including evidence of unemployment (plaintiff has not held employment in 8 years); no functional academic skills (his memory skills are in the mentally retarded range); and no leisure activities (he denied most daily activities such as cooking and cleaning; he has no hobbies or special interests; and he has no friends, structure, social activities, or social life whatsoever). (Doc. 14 at 3-4, citing Tr. 358).

The Commissioner argues that the ALJ reasonably determined that plaintiff does not meet Listing 12.05C because he was not diagnosed with mental retardation and does not have significant adaptive deficits. (Doc. 19 at 10-14). The Commissioner contends the ALJ reasonably determined that plaintiff's IQ scores were invalid and that plaintiff does not have the requisite adaptive deficits in light of (1) Dr. Virgil's observations that plaintiff graduated from high school and had normal insight, judgment, speech, and memory (both recent and remote) (Tr. 22, 357); and (2) Dr. Virgil's conclusions that plaintiff could manage benefits, complete unskilled work activity, and cooperate with co-workers and supervisors in a work setting. (Tr. 360). The Commissioner notes that Dr. Virgil estimated plaintiff's functioning to be within the borderline level and not the mentally retarded level (Tr. 22, 359) and asserts that plaintiff did not submit any school records verifying his claim that he attended special education classes. The Commissioner further points to Dr. Goldsmith's report indicating plaintiff was not mentally retarded and did not meet Listing 12.05C. (Tr. 361-378).

As an initial matter, the Court notes that whether plaintiff was diagnosed with mental retardation is not dispositive of whether he meets Listing 12.05C. *See Breitenstein v. Astrue*, No. 3:10-cv-32, 2011 WL 1235018, at *12 (S.D. Ohio Jan. 6, 2011) (Report and Recommendation), *adopted*, 2011 WL 1234902 (S.D. Ohio March 30, 2011) ("[I]nstead of requiring evidence of a diagnosis of mental retardation, the correct analysis focuses on whether the evidence of record meets or equals Listing 12.05's introductory paragraph and Listing 12.05C's criteria."); *Wilkerson v. Comm'r of Soc. Sec.*, No. 3:08-cv-419, 2010 WL 817307, at *13 (S.D. Ohio March 5, 2010) ("Requiring such a diagnosis in cases of mental retardation would place formalism over substantive evidence."). In other words, a formal medical diagnosis of mental retardation is not conclusive one way or the other. *Cf. Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) ("[T]he mere diagnosis of [an impairment], of course, says nothing about the severity of the condition."). Therefore, whether or not plaintiff has been diagnosed with mental retardation is not determinative of whether he meets Listing 12.05C.

The ALJ gave two reasons for determining that plaintiff did not meet Listing 12.05C: (1) plaintiff did not have a valid verbal, performance, or full scale IQ of 60 through 70; and (2) plaintiff did not have a physical or other mental impairment imposing an additional and significant work-related limitation of function. (Tr. 20).

The ALJ's findings are without substantial support in the record. Neither Dr. Virgil nor Dr. Goldsmith questioned the validity of plaintiff's sub-70 IQ scores. There is nothing in their reports or the record to suggest that the IQ scores were invalid, that plaintiff was a malingerer, or that plaintiff failed to put forth sufficient effort during testing. In addition, the ALJ's own findings show that plaintiff suffered from additional severe mental and physical impairments

sufficient to meet the 12.05C criteria. (Tr. 19 – finding the following impairments to be severe: "chronic obstructive pulmonary disease, history of colostomy with perforated diverticulitis, deafness, obesity (height of 5'9" and weight of 250 pounds), depression, borderline intellectual functioning, degenerative joint disease (knee and back pain), hypertension, coronary artery disease with left ventricular ejection fraction of 55%, and sleep apnea"). *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00 A ("For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c).").

The Commissioner argues that plaintiff nevertheless failed to demonstrate "significant adaptive deficits" (Doc. 19 at 11) to meet the diagnostic description of Listing 12.05C, citing to Dr. Virgil's finding that plaintiff functioned in the "estimated borderline range" of intelligence, as well as Dr. Virgil's opinion that plaintiff could manage benefits, complete unskilled work activity, and cooperate with co-workers and supervisors in a work setting. (Doc. 19 at 13, citing Tr. 360).

The problems with the Commissioner's argument are twofold. First, the ALJ did not make any findings with respect to plaintiff's deficits in adaptive functioning that would preclude a finding that plaintiff meets Listing 12.05C. Rather, the ALJ's decision addressed only whether plaintiff had valid IQ scores and exhibited an additional physical or other mental impairment. However, there was substantial evidence that plaintiff suffered from deficits in adaptive functioning and the ALJ failed to acknowledge or address this evidence.

For example, Dr. Virgil noted deficits in self-care (appearing in tattered and soiled attire with "marginal" grooming and cleanliness); leisure activities (denied having any hobbies or special interests); and social/interpersonal skills (denied having any friends or involvement in structured social activities). (Tr. 358). Plaintiff exhibited memory skills in the mentally retarded range (Tr. 359), his daily activities were assessed as moderately impaired (Tr. 360), and he participated in special education classes in school. (Tr. 357). Dr. Goldsmith likewise opined that plaintiff had moderate functional limitations in daily living activities as well as moderate limitations in maintaining concentration, persistence or pace. (Tr. 375). And contrary to Dr. Goldsmith's and the Commissioner's assertion that plaintiff failed to submit school records verifying his claim that he was in special education classes (Doc. 19 at 12, Tr. 363), the record in fact contains report cards showing plaintiff attended special education classes in the tenth, eleventh and twelfth grades and achieved academic aptitude scores at the low to mid-end of the "below average" range. (Tr. 208-209). Dr. Goldsmith's assessment suggests that the presence of school records verifying plaintiff's participation in special education classes is an important factor in assessing the severity of plaintiff's mental functioning, yet neither Dr. Goldsmith nor the ALJ acknowledged the existence of such records in the evidence of record. The evidence the ALJ failed to discuss is strong circumstantial evidence suggesting that plaintiff's adaptive deficits existed prior to age 22 as required under Listing 12.05C. *See Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) (circumstantial evidence, including participation in special education classes and dropping out in an early grade, is sufficient to establish onset of mental retardation before age 22); *Markle v. Barnhart,* 324 F.3d 182, 189 (3d Cir. 2003) (mental retardation with onset before age 22 supported by special education classes through ninth grade,

dropping out in tenth grade, and struggling to obtain GED); *Pedro v. Astrue*, __ F. Supp.2d __, 2011 WL 1100214 (D. Or. March 23, 2011) (claimant established onset before age 22 by demonstrating attendance in special education classes and history of low skilled work); *Edwards v. Comm'r of Soc. Sec.,* No. 1:07-CV-848, 2008 WL 4425587, at *8 (W.D. Mich. Sept. 9, 2008) (claimant's participation in special education classes and inconsistent work history constituted evidence of deficits in adaptive functioning). Since the ALJ failed to address this evidence of deficits in adaptive functioning, the Court is unable to discern the effect, if any, of this evidence on the ALJ's Listing 12.05C decision.

Second, the Commissioner contends that plaintiff must suffer from "significant" adaptive deficits to meet Listing 12.05C. (Doc. 19 at 11). Yet, the plain language of Listing 12.05C –which requires "deficits in adaptive functioning"– does not specify how severe the deficits need be.[5] Under the Social Security regulations, "loss of adaptive functioning" is "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00 C4. In this case, Dr. Virgil opined that plaintiff's daily activities were "moderately" impaired and that his ability to perform repetitive tasks requiring close attention and concentration were

---

[5] While the Commissioner suggests that the deficits must be significantly severe, it is clear that the deficits need not be as severe as "marked" as that level of severity would qualify an individual for disability under 12.05D. Listing 12.05D requires a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

If the diagnostic description for Listing 12.05 requires more than moderate deficits of adaptive functioning as the Commissioner suggests, Listing 12.05D would be rendered superfluous.

moderately to markedly impaired. (Tr. 360). He rated plaintiff's memory functioning within the mentally retarded level. (Tr. 359). Although Dr. Virgil opined that plaintiff was not prevented from completing unskilled work activity or cooperating with supervisors or co-workers in a work setting, such abilities are not necessarily inconsistent with listing 12.05C. *See Brown v. Sec. of HHS*, 948 F.2d 268, 270 (6th Cir. 1991) (full scale IQ of 68 not inconsistent with obtaining driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry and clean his room); *Wilson v. Astrue*, No. 07-439, 2009 WL 69237, *5 (E.D. Ky. Jan. 9, 2009) (claimant's ability to sustain concentration and interact with others not inconsistent with listing 12.05C).

As the ALJ's decision contains no discussion or even mention of plaintiff's deficits in adaptive functioning in assessing whether plaintiff meets Listing 12.05C, the Court is unable to discern if the ALJ overlooked these deficits or simply ignored them in making his Listing 12.05C finding. Because the ALJ failed to articulate any reasons for rejecting the deficits in adaptive functioning cited by plaintiff, the Court is unable to conclude that the ALJ's Listing 12.05C decision is supported by substantial evidence. Therefore, plaintiff's second assignment of error should be sustained.

**IV. This matter should be reversed and remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher,* 17 F.3d at 176. On remand, the ALJ should properly evaluate plaintiff's use of and reliance on oxygen during the

daytime and the effect thereof on his capacity for work activity.  The ALJ should also reconsider

whether plaintiff meets or equals Listing 12.05C as set forth in this opinion.


**IT IS THEREFORE RECOMMENDED THAT:**

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence

Four of 42 U.S.C. § 405(g).


Date: <u>12/23/2011</u>                                    <u>s/Karen L. Litkovitz          </u>
                                                         Karen L. Litkovitz
                                                         United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

WILLIAM PENDLETON,                                    Case No. 1:10-cv-650
      Plaintiff                                        Dlott, J.
                                                      Litkovitz, M.J.

        vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant


### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).